UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
M.H. and J.H., on behalf of A.H.

                Plaintiffs,

          - against -

MONROE-WOODBURY CENTRAL
SCHOOL DISTRICT,

                Defendant.
-------------------------------------------------------x

04 CV 3029 (CLB)

*Memorandum and Order*

Brieant, J.

      Before this Court, on remand from Our Court of Appeals, is Plaintiffs' motion for

summary judgment (Doc. No. 5) in this case brought under IDEA, as well as Monroe-Woodbury

Central School District's ("the District's" or "Monroe's") cross-motion for summary judgment

(Doc. No. 13). Plaintiffs' and Defendant's motions were filed on August 19, 2004, and

September 3, 2004, respectively. On October 6, 2004, this Court granted Plaintiffs' motion for

summary judgment and denied Defendant's motion. By Summary Order dated December 5,

2005, Our Court of Appeals vacated and remanded this Court's decision for supplementation of

the record:

> The district court in this case overruled the findings of the IHO and SRO without
> discussing the administrative determination that the IEP Monroe offered plaintiffs-
> appellees' child was adequate under the IDEA or explaining why this determination
> should not be credited. Similarly, the district court failed the explain why it rejected
> the administrative findings on the appropriateness of the private educational services
> procured by the plaintiffs-appellees...In addition to addressing the issues discussed in
> this order, the district court should consider the potential impact of *Schaffer v. Weast*
> on the case at bar."

Before proceeding to comply with the Mandate of the Court of Appeals, it should be

noted that the Administrative Record in this case was available to and in possession of the Court when it rendered its decision on October 6, 2004, although due to some administrative error it was not actually docketed in the case file in the district court. It was also available to the lawyers

for both parties who could and did quote in their briefs to this Court those matters within the Administrative Record which they considered material.

The following constitutes this Court's compliance with the Mandate and supplementation of the record. For the foregoing reasons, I still conclude that the IEP was insufficient under IDEA, and therefore grant Plaintiffs' motion for summary judgment. Defendant's motion for summary judgment is denied.

Familiarity with the facts of this case on the part of the reader is assumed. *See Memorandum and Order*, 04 Civ. 3029 (CLB), October 6, 2004. The statute and the applicable legal standards under IDEA are also set forth in the Court's *Memorandum and Order*, 04 Civ. 3029 (CLB), October 6, 2004.

**<u>Discussion</u>**

"[A] motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact. The motion serves as a 'pragmatic procedural mechanism' for reviewing a state's compliance with the procedures set forth in IDEA and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational

benefits." *Warton v. New Fairfield Board of Educ.*, 217 F. Supp. 2d 261, 270 (D. Conn. 2002); *see Wall v. Mattituck-Cutchogue Sch. Dist.*, 945 F. Supp. 501, 508 & n.6 (E.D.N.Y. 1996) (analogizing the role Rule 56 motions play in allowing courts to review administrative determinations in IDEA cases to the role Rule 12(c) motions play in allowing administrative review of Social Security determinations); *see also* 59 F.3d 884, 892 (9th Cir. 1995) ("Though the parties [in an IDEA action] may call the procedure 'a motion for summary judgment' . . ., the procedure is in substance an appeal from an administrative determination, not a summary judgment.").

Under IDEA, the burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief, whether that is the disabled child or the school district. *See Schaffer ex rel. Schaffer v. Weast*, 126 S.Ct. 528, 531 (2005). In this instance therefore, the burden is on the Parent-Plaintiffs to prove that the IEP was insufficient; the parents have satisfied this burden.

In supplementing this Court's *Memorandum and Order*, I must discuss the adequacy of the administrative determination of the IEP as related to the IDEA. For the following reasons, after reviewing the record below, I conclude that the administrative determination made here, to move A.H. into the mainstream public high school, violates the protections afforded him by IDEA and should not be credited. This determination was made against the weight of the objective evidence.

The District's school psychologist, Dr. Mednick, said that A.H. was making very slow progress at Windward (A.H.'s then approved IEP placement) and that A.H. should be in a special education program with a State-approved school. She recommended the Bergen Community School as a suitable location, a school Dr. Mednick claimed used the same educational methods as Monroe, but utilized far smaller class sizes. At a CSE meeting held in July, 2003, A.H.'s parents rejected the Bergen School and asked to have their son evaluated again by Dr. Mednick. Dr. Mednick did so and concluded that A.H. had made no improvements in broad math, reading skills and broad reading, and little improvement in broad written language, reading comprehension and writing skills, to which the IHO and SRO agreed. The evidence does not support this conclusion.

Contrary to the Dr. Mednick's conclusion that A.H. has made no or little improvement, A.H.'s report cards indicate otherwise. A.H.'s report cards from 2001-2002 and 2002-2003 are objective evidence of A.H.'s steady progress, overall, in maintaining satisfactory marks, in increasingly difficult subject matters. *See* Plaintiffs' Exh. 15 (2002-2003 grades for first two semesters (all passing grades in academic subject matters)), Plaintiffs' Exh. 17 (2001-2002 grades show A.H. attained Bs and Cs in all academic subjects). Further evidence of progress is seen in A.H. passing the RCT in Math in January 2002 with a grade of 80% and the Science RCT in January 2003 with a grade of 74%. *See* Plaintiffs' Exh. 17. In June 2003, A.H. earned a place on the upper school's effort honor roll. *See* Plaintiffs' Exh. at p. 46.

Formal grades alone are not the only objective evidence considered by a Court when

determining whether the IEP is supported by the weight of the evidence. Progress reports, teacher testimony, and formal evaluation reports must also be given due consideration when formulating the student's IEP. *See Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186 (2d. Cir. 2005) (where not only were the student's passing grades cited, but also 'progress reports,' 'teacher testimony,' and 'formal evaluation reports' that showed she had made progress). Here, had this form of objective evidence been appropriately considered below, the student would not have been assigned to the mainstream public school. A.H.'s progress reports refute Dr. Mednick's conclusion that A.H. has made little or no progress. The following excerpts from A.H.'s progress reports describe a child who is positive, and extremely motivated to continue to progress, and teachers who believe that he already has. It would be incredulous for this Court to conclude that A.H. has not progressed in his environment, in light of all this objective evidence from numerous teaching professionals who worked closely with A.H. on a regular basis.

As stated in A.H.'s February 2002 progress reports:

> While A.H. continues to have difficulties with decoding, he is still making progress in literature. He is gaining background knowledge through the selections we read in class, and he shows that he has a solid understanding of the material...To his credit, A.H. is always prepared for class, participates cooperatively, and perseveres regardless of how daunting a task is for him. He impresses me with these wonderful qualities. I am sure he will continue to gain skills as the semester continues. Plaintiffs' Exh. 36 at p. 1.

Similarly, with respect to English, "[a]lthough A.H. continues to have great difficulty in spelling and grammatical errors in his papers, he puts forth commendable effort and has made progress nonetheless...He has made, and I am sure he will continue to make, good progress during the second semester." *Id.* at p. 2. With respect to Global History, A.H.'s teacher wrote that A.H. has

"worked fairly consistently since the start of this semester and many of his skills are improving. His grades reflect these efforts...I enjoy working with A.H. and look forward to his continued success." *Id.* at p. 3. With respect to Algebra I, "Anthony made good progress in the first semester." *Id.* at p. 5. With respect to Earth Science, "Anthony is working hard to understand the concepts presented in class...This approach coupled with his steady work habits will help him achieve much this coming semester." *Id.* at 6.

A.H.'s February 2003 progress reports reflect A.H.'s continued effort, and progress in his studies. The SRO seems to have discarded, or at the very least weighed improperly, the significance of this evidence as well. With respect to Literature, A.H.'s teacher wrote that A.H. "[h]as made good progress in Literature this semester. He is working hard and sometimes contributes to our class discussions with keen insight....In his writing, Anthony is making his points more clearly...He is a pleasure to have in class." Plaintiffs' Exh. 15 at p. 3. A.H.'s English Skills teacher wrote, "A.H. has made good progress this semester. His outlining has improved, since he is better able to distinguish from main ideas...He is able to write a reasonable summary of a chapter in three sentences and is developing the ability to do so in only one sentence. A.H. is becoming a more active participant in class and is a pleasure to teach." *Id.* at p. 4. With respect to Global History, A.H.'s teacher wrote, "I have had the privilege of teaching Anthony during the past year and a half. Despite the persistent language-based challenges that Anthony faces, he has a depth of intellect and a sense of the world around him that is not often found in high school students." *Id.* at 5. A.H.'s Study Skills teacher reported that, with respect to Anthony's research paper,

> [i]t was a difficult topic and A.H. had some trouble organizing the information
> and understanding how events played out. He did not back off from the project
> and worked to correct any mistakes. Anthony completed a well structured and
> informative paper. He has shown that he is applying more effort and wants to
> succeed. He has made tremendous stride in many areas of his learning and is
> becoming more of an independent learner by using the strategies taught to him."
> *Id.* at 6.

Considering these teachers' professional evaluations of A.H., coupled with his overall maintenance of his grades from one year to the next, the evidence supports only one reasonable, fair conclusion—that A.H. is a motivated young man, who is progressing, incrementally, despite the very real obstacles presented by his learning impediments. For the IHO to find that he has made negligible, or no, progress, (*see* Plaintiffs' Exh. 1 at p. 5, 7) is a clear misreading and misrepresentation of the objective evidence in the record. The IHO and SRO's determinations cannot, therefore, be credited by this Court.

The only somewhat critical reports A.H. received were from his Algebra II and Biology teachers, and even these reports indicate that A.H. "demonstrated brief periods of excellence at times" (*id*. at p. 7) and that he "is a good student whose capabilities are not reflected in his grades at this time" (*id* at p. 8). These are increasingly difficult subject areas from those A.H. took the year before, and A.H. may have needed more time to adjust to them. This should not negate the overwhelming evidence of progress I have described, *supra.*

There is still further objective evidence of A.H.'s progress at Windward. On the Wide Range Achievement Test, administered by Windward in September 1999 and again in September 2002, A.H. showed significant gains, from a grade equivalency of 3B to 8B in three years. His

percentile rank improved from 4% to 16%, again demonstrating improvement and progress.  *See* Plaintiffs' Exhs. 32, 43.  On the Stanford Math Test, A.H. scored at 5.1 grade equivalency [total score] in May 2000 and at the 7.4 level two years later, in May 2002.  *See* Exh. 20, 31.  In reading, on the Stanford Reading Test, in May 2000, A.H. attained a grade equivalency score of 4.2 in comprehension as compared to a grade equivalency of 5.1 in comprehension two years later.  In vocabulary, A.H. showed progress, from a 3.5 grade equivalency in May 2000 to a 7.1 grade equivalency in May 2002.  *Id.*

Last, the IHO was utterly incorrect in stating that A.H. "has fallen further behind his age-mates" (*IHO Determination* at p. 7) to support her finding that "[t]here is little evidence that A.H. has progressed at Windward." *Id.*  It is undisputed that A.H. was expected to progress at a rate of 0.3-0.5 grade level per year in reading and writing (his primary areas of disability), while his peers would progress at a rate of 1.0 grade level per year.  *See* IHO Transcript at p. 389.  Mathematically, it would be impossible for A.H. to do anything other than fall further behind his age-mates as he progressed at his expected rate of 0.3-0.5; at this rate, the gap can never be reduced, or closed.  To illustrate, consider the following simple example.  Imagine that A.H. and his age-mates are all in 10th grade.  One year later, A.H. will be functioning on a 10.3th grade level or a 10.5th grade level, while his age-mates will be in 11th grade.  This is a difference of 0.5-0.7.  One year after that, A.H. will be functioning at a 10.6-11.0 grade level, while his age-mates will be functioning at a 12th grade level.  This is a difference of 1.0-1.4.  Clearly the gap has increased.  This trend will continue as more time passes.  Therefore, it was improper of the IHO to rely on the widening gap between A.H. and his age-mates as evidence of lack of

progress; it is simply evidence of A.H. progressing more slowly than his peers, which as already stated, was expected.

As to whether A.H.'s IEP ensured that he would continue to progress, as required under IDEA, and not regress, I find that it did not. A.H.'s successes transpired during his time at Windward, where the Orton-Gillingham Method was used throughout his instruction in various subject matters, and he was taught in small classes, at an 8:1 student/teacher ratio, at most. The IHO and SRO dismissed Dr. Babb's recommendation that A.H. continue to be educated in a small class setting. The IHO plainly mischaracterized, and omitted, essential, relevant observations and opinions of the a member of the CSE, A.H.'s teacher from Windward, in order to support a finding that A.H. did not require a small class size in order to reinforce material. The IHO stated:

> ...the reading specialist from Windward, who was familiar with A.H. and his program, reviewed the three year re-evaluation by D's school psychologist and the educational evaluation by D's high school CSE chair. The reading specialist from Windward [Ms. Kathy Abramson] opined that both evaluations were excellent and accurate as to A.H.'s functioning and needs. (T58-9; Ex. 12, p. 1).

This quote reads as though Ms. Abramson stated that "both evaluations were excellent and accurate as to A.H.'s functioning and needs." The citation provided however, refers to the testimony of Dr. Paterno, the CSE chairperson and District School psychologist, not to any testimony given by Ms. Abramson (of which there is none). It was Dr. Paterno's contention that Ms. Abramson indicated that the evaluations were excellent.

Even assuming that Ms. Abramson did believe that the evaluations were excellent, the

IHO, for reasons this Court cannot understand, simply failed to include, or give proper weight to the remainder of Ms.Abramson's opinion. Ms. Abramson "reiterated that the student has progressed somewhat with as much individual attention as she can provide...The advocate queried the student's teacher as to her suggestions for a comparable school. She noted that it should be a setting where the student could receive instruction with an emphasis on individually delivered instruction." Exh. 12. Clearly, a setting such as Kildonan, which has a similar 5-7 students per teacher ratio like Windward, is more akin to "a setting where the student could receive instruction with an emphasis on individually delivered instruction" than Monroe, where A.H. would be instructed in a 15:1 student to teacher ratio, including times when receiving remedial help. *See* Plaintiffs' Exh. 12 and 13, both at p. 2. The IHO also found that A.H. does not have attention-deficit disorder ("ADD"), and therefore does not need a small class size. However, a small sized classroom environment can still be required if the evidence suggests that the child needs to "receive instruction with an emphasis on individually delivered instruction," as recommended by Ms. Abramson, even if the child's disability does not rise to the level of supporting a diagnosis of ADD.[1]

Because A.H. has made reasonable progress at Windward, and for the reasons stated, I conclude that the Plaintiffs' desire, and A.H.'s desire, that A.H. continue in a similar school, Kildonan, was appropriate, and Defendants' proposed placement was not appropriate. Thus, the Plaintiffs have satisfied their burden, showing that the facts presented below weight in favor of

---

[1] *See IHO Determination* at p.8 where Plaintiffs' expert, Dr. Babb, recommended that A.H. be evaluated for ADD/ADHD; Defendant's expert, Dr. Mednick, disagreed.

the conclusion that (1) A.H. did progress at Windward, due in part to the small class size, and in part to the methods used in teaching him and that (2) upon Windward's closing, the parents' choice of Kildonan, a very similar school, was therefore an appropriate means to continue A.H.'s progress. The District's recommendation that A.H. should attend Monroe is conclusory, at best. The evidence does not indicate that A.H.'s progress would have continued at Monroe, a much larger public school, that he did not want to attend. There, A.H. would be taught in a classroom with twice as many students than while at Windward, in a school not exclusively dedicated to teaching children with dyslexia. This environment at Monroe was previously determined to be inadequate and did not serve his educational needs. To move him back into the mainstream public school within the prescribed program set for the in the IEP, does not sufficiently ensure that A.H. will continue to progress and not regress, as required under IDEA. A.H. has already progressed at Windward; he is entitled to continue to progress at Kildonan.

## Conclusion

Plaintiffs' motion for summary judgment (Doc. No. 5 ) is granted and Defendant's motion (Doc. No. 13) is denied. Settle a proposed final judgment on ten (10) days notice or waiver of notice. Plaintiffs are also entitled to reasonable attorney's fees under 20 U.S.C. 1415(i)(3)(B), and shall serve and file the lodestar computation forthwith.

SO ORDERED.

Dated: White Plains, New York
     March 20, 2006

                                     _____
                                     Charles L. Brieant, U.S.D.J.